1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   MARVIN D. HORNE and LAURA R.                    CASE NO. CV-F-08-1549 LJO SMS
     HORNE, d.b.a. RAISIN VALLEY FARMS
12   and RAISIN VALLEY FARMS MARKETING              **ORDER ON CROSS MOTIONS**
     ASSOCIATION; MARVIN D. HORNE;                  **FOR SUMMARY JUDGMENT**
13   LAURA R. HORNE; DON DURBAHN;                   (Docs. 24, 26)
     and the ESTATE of RENA DURBAHN,
14   d.b.a. LASSEN VINEYARDS,

15                          Plaintiffs,

16          vs.

17   UNITED STATE DEPARTMENT
     OF AGRICULTURE,
18
                            Defendant.
19   _____/

20                          **I. INTRODUCTION**

21          Plaintiffs appeal an administrative decision of a defendant United States Department of

22   Agriculture ("USDA") Judicial Officer ("JO") that imposed civil penalties and assessments for

23   Plaintiffs' alleged violation of various provisions of the Agricultural Marketing Agreement Act of 1937,

24   as amended, 7 U.S.C. §601 et seq. ("AMAA") and the order regulating the Handling of Raisins Produced

25   from Raisin Variety Grapes Grown in California, 7 C.F.R. Part 989 ("Marketing Order").  This appeal

26   presents four issues on cross motions for summary judgment: First, this Court considers Plaintiffs'

27   challenge to the JO's opinion that Plaintiffs are "handlers" who "acquired" raisins and were therefore

28   subject to the Marketing Order.  Second, the Court considers whether the penalties imposed by the JO

1   violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.  Third,

2   the Court is asked to decide whether the Marketing Order's reserve requirement violates the Due Process

3   Clause of the Fifth Amendment to the United States Constitution as a physical taking of Plaintiffs'

4   property without just compensation.  Finally, this Court determines whether the JO's decision to dismiss

5   Plaintiffs' administrative petition was arbitrary, capricious, an abuse of discretion, and contrary to the

6   law.  Having read and reviewed the parties' arguments, and considering the administrative record and

7   the applicable case law, this Court GRANTS summary judgment in favor of defendant USDA and

8   against Plaintiffs.

9   **II. BACKGROUND**

10  **A.    Legal Framework**

11          "The AMAA was originally enacted during the Depression, with the objective of helping farmers

12  obtain a fair value for their agricultural products." *Lion Raisins, Inc. v. U.S.*, 416 F.3d 1356, 1358 (Fed.

13  Cir. 2005) ("*Lion III*"), *citing Pescosolido v. Block*, 765 F.2d 827, 828 (9th Cir.1985); 7 U.S.C. § 602

14  (2000).  The AMAA "contemplates a cooperative venture among the Secretary [of Agriculture],

15  handlers, and producers the principal purposes of which are to raise the price of agricultural products

16  and to establish an orderly system for marketing them." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346

17  (1984).  To accomplish this, the AMAA delegates authority to the Secretary of Agriculture to issue

18  marketing orders regulating the sale and delivery of various commodities, including raisins.  The

19  Marketing Order was created in an effort to limit the supply of raisins on the open market, and thus, to

20  stabilize prices.  *See* 7 U.S.C. §§608c (1), (2), (6)(C).

21          The Marketing Order does not regulate raisin producers (i.e., growers, farmers).  Instead,

22  "handlers" of California raisins are subject to the requirements of the Marketing Order, 7 C.F.R. §981.1

23  et seq.  Handlers who acquire raisins are required, inter alia,  to: (1) obtain USDA inspections of raisins

24  acquired or received from growers, 7 C.F.R. §989.58(d); (2) file accurate reports with the USDA's

25  Raisin Administrative Committee ("RAC"),  7 C.F.R. § 989.73; and (3) allow access to records to verify

26  the accuracy of the reports filed with the RAC. 7 C.F.R. §989.77.  The USDA may obtain injunctive

27  relief, civil penalties, and criminal penalties against handlers who fail to comply with the regulatory

28  provisions of the Marketing Order. 7 U.S.C. §§ 608a(5), 608a(6), 608c(14).

The Marketing Order creates the RAC, a raisin industry group responsible for the administration of the Marketing Order.  The RAC is composed of forty-seven members who represent different groups in the raisin industry, including thirty-five producers, ten handlers, one cooperative bargaining association, and one member of the public. The RAC is an agent of the federal government. Members of the RAC are nominated by the industry groups and appointed by the Secretary of Agriculture. 7 C.F.R. §§989.26, .29, .30.  The RAC receives no federal appropriations.  To fund the RAC, handlers must pay an $8 per ton assessment for free tonnage raisins. 7 C.F.R. §989.90.  The assessments pay for approximately 50% of the administration costs of the RAC. 7 C.F.R. §§989.53, 989.79, 989.80(a), 989.82.

The Marketing Order is designed "to prevent over-production of agricultural products and excessive competition in marketing them, with price stabilization as the ultimate objective." *Parker v. Brown*, 317 U.S. 341, 368 (1943).  To accomplish this goal, and as an additional way to fund the RAC, the Marketing Order contains a reserve requirement.  The Marketing Order reserve requirement requires handlers to separate the raisins they receive or acquire from producers into "reserve tonnage" raisins for the benefit of the RAC and  "free tonnage" raisins.  Handlers may sell the free tonnage raisins on the open markets.  The reserve tonnage is determined each year as a portion of the raisins that handlers buy from producers.  Handlers are required to transfer the reserve tonnage to the RAC. 7 C.F.R. §989.66, 989.166.  While raisin producers hold an equity interest in the reserve tonnage, the RAC may sell or dispose of the reserve raisins in secondary, non-competitive markets.  The RAC uses some of the proceeds to fund its administration.  The RAC pays to the producers any net proceeds remaining after it has disposed of the crop year's reserve raisins.  It generally takes a few years for the RAC to dispose of a crop year's reserve tonnage raisins.

**B.      Plaintiffs' alleged activities**

Marvin D. Horne ("Mr. Horne") has been a raisin farmer since 1969.  Administrative Record ("AR") 1646.  Mr. Horne and his wife, Laura R. Horne ("Ms. Horne") (collectively "the Hornes") produce raisins under the name of Raisin Valley Farms. *Id*.  AR 1646, 1732.  Raisin Valley Farms is a California general partnership, with the Hornes as partners.  The Raisin Valley Farms name was registered in 1999.

Mr. Horne determined to sell his Raisin Valley Farms raisins without the use of a packer or handler, because he felt that the packers and the RAC "were stealing [his] crop." AR 1676. Mr. Horne consulted with many people, including attorneys, university professors, and officials, in an attempt to create a way to market his raisins without the use of the raisin packer system. Mr. Horne also exchanged several letters with the USDA in an effort to determine how he could market his raisins without becoming subject to the Marketing Order, as discussed in the relevant sections below. The focus of this action relates to the Hornes' activities during the 2002-2003 and 2003-2004 crop years,[1] when the Hornes implemented their plan to market raisins outside of the bounds of the Marketing Order.

Mr. Horne, a former alternate member of the RAC, became a vocal opponent of the Marketing Order. AR 954. Mr. Horne wrote multiple letters to the Secretary of Agriculture and to the RAC to complain about the Marketing Order. AR 6343-44; AR 2423. On April 23, 2002, the Hornes sent a letter to the Secretary of Agriculture and to the RAC asserting that they were registering as a handler "under protest" because:

> we are growers that will pack and market our raisins. We reserve our rights under the Constitution of the United States...[T]he Marketing Order Regulating Raisins has become a tool for grower bankruptcy, poverty, and involuntary servitude. The Marketing Order Regulating Raisins is a complete failure for growers, handlers, and the USDA...[W]e will not relinquish ownership of our crop. We put forth the money and effort to grow it, not the Raisin Administrative Committee. This is America, not a communist state.

AR 2423. Thereafter, the USDA issued Plaintiffs handler number 94-101 in 2002.

In addition to growing raisins through Raisin Valley Farms, the Hornes entered into a partnership with Ms. Horne's parents, Don Durbahn ("Mr. Durbahn") and Rena Durbahn (collectively, "the Durbahns"), to create Lassen Vineyards. AR 1647-1850, 5550. Lassen Vineyards is a California general partnership between the Hornes and the Durbahns. Lassen Vineyards grows grapes and produces raisins. In addition to its grape growing activities, Lassen Vineyards purchased equipment to clean, stem, sort, and package raisins in 2001.

The Lassen Vineyards raisin packing equipment and facilities were located on land owned by Lassen Vineyards. Mr. Durbahn oversaw the Lassen Vineyard raisin packing plant. Mr. Horne's son,

---

[1]The crop year for raisins begins on August 1 and ends on July 31 of the following year.

Marvin Horne, Jr. ("Marvin") was the plant manager.  The equipment at the plant operated by Lassen Vineyards cleaned, stemmed, sorted, and packaged raisins throughout the 2002-2003 and 2003-2004 crop years.  During this time, Lassen Vineyards packed Raisin Valley Farms and Lassen Vineyards raisins, and packed other farmer's raisins for a fee.

Raisins that were packed at Lassen Vineyards' plant were marketed and sold to wholesale customers by Raisin Valley Farms Marketing Association, an unincorporated association organized and operated by the Hornes ("Raisin Valley Marketing"), during crop years 2002-2003 and 2003-2004. AR 1652, 1996-97, 2117.  Over 60 raisin growers joined Raisin Valley Marketing to gain volume selling power.  Grower members of Raisin Valley Marketing sent their raisins to Lassen Vineyards' plant to be cleaned, stemmed, sorted, and packaged.  According to Plaintiffs, Raisin Valley Marketing sold raisins on behalf of its members, while the growers maintained ownership.  According to Mr. Horne, Raisin Valley Marketing held grower sales funds in a trust account, paid Lassen Vineyards for the use of their equipment, paid a third party broker fee, and distributed the net proceeds to the growers.

Lassen Vineyards charged a fee to Raisin Valley Marketing members, typically twelve cents per pound, to pack California raisins at the plant.  Lassen Vineyards charged these growers an additional five dollars per pallet for raisins that were boxed and stacked. AR 1940-41, 1957.  The packing fee covered the cost of the labor and packaging materials. AR 1942-44.  The workers who operated the equipment were "leased" to Lassen Vineyards by Ms. Horne and Ms. Durbahn.  AR 1710.  The Lassen Vineyards packing operation was supervised on a daily basis by Mr. Durbahn and Marvin, whose wages were paid by Lassen Vineyards. AR 1948-49.

Plaintiffs contend that during the 2002-2003 and 2003-2004 crop years: Lassen Vineyards was a "leasing company" that "rented" the equipment to other growers to clean, stem, and sort their own raisins and "leased" employees of the plant who operated the machinery; Mr. Durbahn did not process raisins as a handler, he oversaw the operation of a leased plant; Marvin managed the leased equipment; growers leasing the equipment from the Lassen Vineyards plant were assigned lot numbers to preserve the identity of their product; Lassen Vineyards never stored, purchased, controlled, acquired, or handled raisins; growers using the facilities engaged in the cleaning, stemming, sorting, grading, and packing function through leased employees and equipment; and lessees maintained right, title, ownership, and

control of the raisins until they were sold to the consumer market.  Plaintiffs maintain that they were exempt from the Marketing Order during the 2002-2003 and 2003-2004 crop years, because they were raisin growers, never acquired raisins, and were working within the Farmers to Consumers Direct Marketing Act.

In his testimony, Mr. Horne admitted that both Lassen Vineyards and Raisin Valley Farms acted as "packers" under the Marketing Order during the 2002-2003 and 2003-2004 crop years. AR 1761-62. Mr. Horne admitted that Raisin Valley Farms did not pay assessments, did not have incoming inspections performed, did not hold raisins in reserve, and did not report acquisitions of raisins during the 2002-2003 and 2003-2004 crop years. AR 1743-45.  When asked whether he held raisins in reserve, Mr. Horne replied, "No.  They're my raisins." AR 1743.  He admitted that his reports to the RAC disclosed "zero acquisitions." AR 1744.

Mr. Horne admitted that for crop years 2002-2003 and 2003-2004, Lassen Vineyards operated a packing house on land with equipment owned jointly by the Hornes and the Durbahns. AR 1685.  Mr. Horne further admitted that Lassen Vineyards did not pay assessments, did not have incoming inspections performed, did not hold raisins in reserve, and did not report acquisitions of raisins during the 2002-2003 and 2003-2004 crop years , because "they're not acquired raisins." AR 1747-51.

The USDA performed outgoing inspections on the raisins packed at Lassen Vineyards. AR 1745, 1747-48.  During the hearing, the USDA introduced evidence that Lassen Vineyards packed out more than 1.2 million pounds of raisins during the 2002-2003 crop year and more than 1.9 million pounds of raisins for the 2003-2004 crop year. AR 740-51, 2186-2304, AR 2602-5512.

C.    **Administrator's Proceedings against Plaintiffs**

On April 1, 2004, AJ Yates, Administrator of the Agriculture of the Agriculture Marketing Service ("administrator") filed a complaint before the Secretary of Agriculture against the Hornes, d.b.a. Raisin Valley Farms (collectively referred to as "Raisin Valley Farms"). AR 1-5.  The administrator's complaint alleged that Raisin Valley Farms was "engaged in the business as 'handler' of California raisins" during the 2002-2003 and 2003-2004 crop years. AR 1.  The administrator alleged that Raisin Valley Farms violated the AMAA and the Marketing Order by submitting inaccurate forms to the RAC, failing to hold inspections of incoming raisins, failing to hold raisins in reserve, failing to pay

6

1  assessments, and failing to allow access to records.  The administrator filed an amended complaint on

2  October 25, 2004.

3       Raisin Valley Farms denied the allegations.  In addition, Raisin Valley Farms filed an amended

4  answer on January 21, 2005 asserting various affirmative defenses, including that the AMAA and the

5  Marketing Order are unconstitutional; Raisin Valley Farms is not a handler and did not acquire physical

6  possession of raisins within the meaning of the regulations; Raisin Valley Farms did not handle or

7  acquire raisins of third-party producers that processed their raisins through equipment owned by Lassen

8  Vineyards; and Raisin Valley Farms was not required to comply with the reporting, incoming inspection,

9  and other requirements alleged in the amended complaint. AR 82-88.

10      A hearing on the administrator's action took place in front of the administrative law judge

11  ("ALJ") between February 9-11, 2005.  At the February 2005 hearing, Mr. Horne testified.  After the

12  hearing, and to conform the complaint to the evidence presented at the February 2005 hearing, the

13  administrator moved to amend the complaint to include Raisin Valley Marketing and the Hornes and

14  the Durbahns, doing business as Lassen Vineyards (collectively referred to as "Lassen Vineyards") as

15  parties to the administrative proceedings.[2]  The ALJ granted the administrator's opposed motion to

16  amend, and the second amended complaint was filed on August 10, 2005.  Thereafter, a second hearing

17  took place on May 23, 2006.

18      On November 1, 2006, the ALJ issued a decision and order finding that the Hornes and the

19  Durbahns, "acting together as partners doing business as Lassen Vineyards" acted as first handlers of

20  raisins and were subject to the Marketing Order.  The ALJ found that Lassen Vineyards violated the

21  AMAA and the Marketing Order, and ordered Lassen Vineyards (the Hornes and Mr. Durbahn), to pay

22  the following, jointly and severally: (1) $731,500 in civil penalties; (2) $9,389.73 in assessments; and

23  (3) $523,037 as the dollar equivalent of the raisins that Lassen Vineyards failed to hold in reserve.

24      Plaintiffs appealed the ALJ's decision to the JO on January 4, 2007.  In its April 11, 2007

25  Decision and Order ("Initial Decision"), the JO found  that Raisin Valley Farms *and* Lassen Vineyards

26

27      [2]Ms. Durbahn died after the initial administrative action was filed but before Lassen Vineyards was added as a party
   to the administrative complaint.  It is unclear from the record whether the Estate of Rena Durbahn was added as a party to
28  the administrative proceedings, although the Estate of Rena Durbahn is a plaintiff in this action.

committed the following violations of the Marketing Order:

1.   Twenty violations of 7 C.F.R. 989.73 for filing inaccurate reporting forms to the RAC;

2.   Fifty-eight violations of 7 C.F.R. §989.58(d) for failure to obtain incoming inspections;

3.   Two violations of 7 C.F.R. §989.66 for failure to hold reserve raisins for crop year 2002-2003 and 2003-2004;

4.   Two violations of 7 C.F.R. §989.80 for failure to pay assessments to the RAC; and

5.   One violation of 7 C.F.R. §989.77 for failure to allow the Agricultural Marketing Service to have access to the records.

AR 665-706. The administrator sought reconsideration of the JO's Initial Decision, challenging the JO's calculations of the civil penalties and assessments. In its Order Granting Petition to Reconsider, issued September 18, 2008 ("Reconsideration Order"), the JO imposed the following penalties against Lassen Vineyards and Raisin Valley Farms, jointly and severally:

1.   $202,600.00 as a civil penalty;

2.   $8,783.39 in assessments for the 2002-2003 and 2003-2004 crop years; and

3.   $483,843.53 for the alleged dollar equivalent of the California raisins Plaintiffs failed to hold in reserve for the 2002-2003 and 2003-2004 crop years.

AR 757-778.

**D.   Plaintiffs' Administrative Petition Against USDA**

Plaintiffs filed an administrative petition on March 5, 2007 to challenge various Marketing Order regulations. Plaintiffs filed their administrative petition pursuant to 7 U.S.C. §608c(15)(A), a procedure created by the AMAA that expressly provides *handlers* an administrative procedure to challenge the Marketing Order. *See United Dairyman of Ariz. v. Veneman*, 279 F.3d 1160, 1164 (9th Cir. 2002). In moving to dismiss Plaintiffs' petition, the USDA argued, among other things, that since Plaintiffs did not admit that they were handlers during the time period in question, they had no jurisdiction to file an administrative petition as handlers. The ALJ denied the USDA's motion to dismiss, reasoning that because the USDA investigated Plaintiffs, determined Plaintiffs were handlers, and initiated proceedings against Plaintiffs to establish they were handlers, Plaintiffs had jurisdiction to file an administrative petition pursuant to 7 U.S.C. §608c(15)(A). The administrator appealed the ALJ's denial of its motion

8

to dismiss.  On February 4, 2008, the JO agreed with the administrator to rule that Plaintiffs lacked jurisdiction to file an administrative petition pursuant to 7 U.S.C. §608c(15)(A).

On March 18, 2008, forty-three days after the JO's decision, Plaintiffs initiated an action in this Court to appeal the JO's decision. *Horne v. USDA*, CV-08-402 OWW SMS.  The USDA moved to dismiss for lack of subject matter jurisdiction. On November 13, 2008, Judge Oliver W. Wanger granted the USDA's motion to dismiss, finding that Plaintiffs' appeal was untimely pursuant 7 U.S.C. §608c(15)(B).  Plaintiffs appealed Judge Wanger's decision to the Ninth Circuit Court of Appeals.  That appeal remains pending.

**E.      Procedural History**

On October 14, 2008, Plaintiffs[3] filed their complaint in this Court seeking declaration relief and review of the USDA's decision pursuant to 7 U.S.C. §608c(14)(B).  Plaintiffs moved for summary judgment on August 28, 2009.  The USDA moved for summary judgment on October 6, 2009.  Plaintiffs opposed the USDA's motion on November 3, 2009.  The USDA opposed Plaintiffs' motion on November 19, 2009.  As no party requested oral argument, this Court vacated the December 4, 2009 hearing by minute order on November 30, 2009.

**III. STANDARD OF REVIEW**

Plaintiffs challenge the JO's Initial Decision and Reconsideration Order pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).  When reviewing an order under the APA, "[j]udicial review of an agency decision is narrow." *Balice v. USDA*, 203 F.3d 684, 689 (9th Cir. 2000).  This Court may not weigh the evidence and substitute its own findings for those of the agency. *Id*.  According to the statute, this Court may set aside an agency decision only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).  An agency does not act in an arbitrary and capricious manner when it presents a "rational connection

---

[3]Plaintiffs are the Hornes, d.b.a. Raisin Valley Farms; the Hornes' unincorporated association Raisin Valley Marketing; and the Hornes, Mr. Durbahn, and the Estate of Rena Durbahn, d.b.a. Lassen Vineyards.  Although the JO's orders affect the Hornes, Mr. Durbahn, Lassen Vineyards, and Raisin Valley Farms, all plaintiffs collectively assert their arguments against the JO's orders.  Accordingly, when referring to Plaintiffs' arguments, this Court's use of the term "Plaintiffs" refers to all of the named plaintiffs.  When referring to "Plaintiffs" with regard to the JO's orders, the term "Plaintiffs" refers only to those plaintiffs affected by the JO's orders.  To avoid confusion, this Court will use specific plaintiff names where practicable.

between the facts found and the conclusions made." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir.2004).

In an action for judicial review of an administrative decision, the burdens of persuasion and proof rest with the party challenging the ALJ's or JO's decision. *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir.1994), *superceded on other grounds by statute, as recognized in M.L. v. Federal Way Sch. Distr.*, 341 F.3d 1052 n.7 (9th Cir. 2003); *see also, Sorenson Communications, Inc. v. F.C.C.*, 567 F.3d 1215 (10th Cir. 2009) (in APA challenge of agency decision, burden is on petitioner to establish the action is arbitrary and capricious); *Transportation Workers Union of America, AFL-CIO v. Transportation Sec. Admin.*, 492 F.3d 471 (D.C. Cir. 2007) (on petition for review of order of administrative agency, petitioner bears the burden of production on appeal and must support each element of its claim to challenge order by affidavit or other evidence); *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49 (1st Cir. 2001) (those who assail an agency's findings or reasoning have the burden to identify the defects in evidence and the faults in reasoning.).

The APA authorizes this Court to set aside factual findings only if they are "unsupported by substantial evidence." 5 U.S.C. §706(2)(E); *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 589 (9th Cir. 1998); *Balice*, 203 F.3d at 689.   Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).   "Substantial evidence is more than a scintilla but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).   If the record supports more than one rational interpretation of the evidence, the Court will defer to the administrative officer's decision. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).   Thus, in its review of a JO decision, the Court will not substitute its judgment for that of the agency. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

## IV. DISCUSSION

**A.      Whether Plaintiffs are "handlers" who "acquired" raisins and are therefore subject to the Raisin Order**

The JO found that Lassen Vineyards and Raisin Valley Farms were handlers who acquired raisins

10

and, therefore, were subject to the Marketing Order during the 2002-2003 and 2003-2004 crop years. The JO further found that Lassen Vineyards and Raisin Valley Farms violated numerous provisions of the AMAA and Marketing Order.  The parties do not dispute that a handler that acquires raisins is required to obtain incoming inspections, hold the designated amount in reserve, file reports with the RAC, allow access to records to verify the accuracy of the reports, and pay assessments to the RAC. 7 C.F.R. §§989.58(d); 989.66; 989.166; 989.73; 989.77; and 989.90.

In this challenge to the JO's decision, Plaintiffs advance multiple theories that they were either not subject to the Marketing Order or qualified for an exemption.  First, Plaintiffs claim that they were not subject to the Marketing Order because they were not handlers.  Second, Plaintiffs contend that they were not subject to the Marketing Order because they did not acquire raisins.   Third, Plaintiffs assert that prior USDA opinion letters to Plaintiffs support Plaintiffs' position that they would not be subject to the Marketing Order for their activities.  Fourth, Plaintiffs argue that there is no evidence that any plaintiff was a handler.  Fifth, Plaintiffs assert that the Marketing Order does not apply to lessors of packing equipment.  Sixth, Plaintiffs argue that as raisin growers they were exempt from the Marketing Order.  Seventh, Plaintiffs argue that the Farmer to Consumer Direct Marketing Act creates an applicable exemption to the Marketing Order.  The Court considers, and ultimately rejects, each of Plaintiffs' arguments below.

**1.      Plaintiffs were "handlers"**

Plaintiffs contend that the JO erred to conclude that they were handlers, because the substantial evidence demonstrates that they are raisin growers, not raisin handlers.  A "handler" is:

> (a) any processor or packer; (b) any person who places, ships, or continues natural conditioned raisins in the current of commerce from within the area to any point outside thereof; (c) any person who delivers off-grade raisins, other failing raisins or raisin residual material to other than a packer or other than into any eligible non-normal outlet; or (d) any person who blends raisins [subject to certain exceptions].

7 C.F.R. §989.15.  According to this definition, an entity is a handler if it is a packer.  A "packer" is:

> any person who, within [California], stems, sorts, cleans, or seeds raisins, grades stemmed raisins, or packages raisins for market as raisins: *Provided, That*:
> (a) No producer with respect to the raisins produced by him, and no group of producers with respect to raisins produced by the producers comprising the group, and not otherwise a packer, shall be deemed a packer if he or it sorts or cleans (with or without water) such raisins in their unstemmed form;

7 C.F.R. §989.14 (emphasis in original).  Thus, if Plaintiffs engaged in stemming, sorting, cleaning, seeding, grading, or packaging of raisins within California, they were "handlers" pursuant to the Marketing Order.  Plaintiffs may also be handlers if they "place natural conditioned raisins in the current of commerce." 7 C.F.R. 989.§15.

The evidence establishes that Lassen Vineyards stemmed, sorted, cleaned and packaged raisins.  Thus, pursuant to 7 C.F.R. §989.14, Lassen Vineyards was a handler of raisins.  Substantial evidence further establishes that Raisin Valley Farms contributed to the packing of raisins at the Lassen Vineyards plant, as discussed more fully below.  Moreover, substantial evidence shows that Raisin Valley Farms placed raisins in the stream of interstate commerce.  Accordingly, Raisin Valley Farms was a handler.

Plaintiffs argue, however, that as raisin producers, both Lassen Vineyards and Raisin Valley Farms are exempt from the definition of packer.  Plaintiffs correctly point out that according to the definition,  "[n]o producer with respect to the raisins produced by him...shall be deemed a packer if he or it sorts or cleans...such raisins in their unstemmed form."  7 C.F.R. §989.14.  Plaintiffs fail to demonstrate, however, that Lassen Vineyards or Raisin Valley Farms sorted or cleaned their raisins in an *unstemmed* form.  The substantial evidence introduced by the USDA at the administrative hearing supports the JO's conclusion that Lassen Vineyards stemmed the raisins in addition to the other packing activities.  In addition, Plaintiffs concede that the definition of handler within the Marketing Order "captured within its scope any producer who seeds, grades, packages, or stems raisins or places raisins into interstate commerce." Pl. Mem., 15 (referencing 7 C.F.R. §§989.14, 989.15).  Accordingly, this exemption is inapplicable to Plaintiffs.  Because the substantial evidence demonstrates that Plaintiffs engaged in stemming, sorting, cleaning, seeding, grading, or packaging of raisins within California, they were "handlers" pursuant, and subject, to the Marketing Order.

### 2. Plaintiffs "acquired" raisins

Plaintiffs contend that there is no evidence that they "acquired" raisins.  Plaintiffs argue that the USDA "failed to produce any evidence of a single seller, or buyer, or evidence of consideration or of title transfer.  It failed to prove a sale of goods as is required for a simple, ordinary case governed by the Uniform Commercial Code, and it offered no proof of any acquisition."  Plaintiffs construe the term "acquire" to require a purchase and sale of goods as demonstrated by the transfer of title.

This Court agrees with the JO that Plaintiffs "arguments that they did not acquire raisins are unavailing in light of the plain meaning of the language of the Raisin Order defining the term." AR 773. The Marketing Order defines "acquire" in the following way:

> "Acquire" means to have or obtain physical possession of raisins by a handler at his packing or processing plant or at any other established receiving station, operated by him: provided that a handler shall not be deemed to acquire raisins (including raisins produced or dehydrated by him) while: (a) he stores them for another person or as a handler-produced tonnage in compliance with the provisions of 989.58 & 989.70; (b) he reconditions them, or; (c) he has them in his possession for the purpose of inspection, and provided further, that the term shall apply only to the handler who first acquires the raisins.

7 C.F.R. §989.17. This definition is not ambiguous. Plaintiffs "acquire" raisins if they "obtain physical possession of raisins...at [the] packing or processing plant...operated by [them]." The definition cannot be interpreted reasonably to required a sale of goods under the UCC, as Plaintiffs argue. The plain and unambiguous definition of "acquire" requires "physical possession" at a packing facility; it does not require the transfer of legal title.

Reasonable inferences made from substantial evidence support the JO's conclusion that Plaintiffs acquired raisins. The JO noted: "The record does not contain direct evidence that Mr. Horne and partners 'received' raisins but there is ample evidence that they 'packed-out' raisins (CX 82-CX 87). Logic allows me to conclude that raisins cannot be 'packed-out' unless they are received." AR 677, n.4. Under the same sound logic, this Court finds that substantial evidence supports the JO's finding that Plaintiffs acquired raisins during the 2002-2003 and 2003-2004 crop years. The uncontroverted evidence demonstrates that Plaintiffs stemmed, sorted, cleaned and packaged raisins at Lassen Vineyard's plant. During the hearing, the USDA introduced evidence that Plaintiffs, in their operation of Lassen Vineyards and using Raisin Valley Farms' handler number stamp, "packed out" more than 1.2 million pounds of raisins during the 2002-2003 crop year and more than 1.9 million pounds of raisins for the 2003-2004 crop year. This evidence supports the logical conclusion that Plaintiffs has physical possession of, and thus acquired, those raisins that they handled and packed out at Lassen Vineyards.

### 3.   USDA Opinion Letters were Consistent with the JO's Decision

Plaintiffs contend that an April 23, 2001 letter from Robert Keeney of USDA-AMS Fruit and Vegetable Programs ("Keeney Letter") "should be dispositive of this case." The Keeney Letter reads:

13

> In your letter, you indicated that Raisin Valley Farms has entered into an agreement with Del Rey Packing Company (Del Rey) whereby Del Rey will "custom pack" all of Raisin Valley's organic raisin crop. Del Rey will perform "packer" functions on Raisin Valley Farms' raisins such as stemming, sorting, and seeding. Del Rey will also ensure that the raisins are inspected but will not take title to the raisins...
>
> [I]n this situation you described, you are correct that Raisin Valley Farms would be neither a packer nor a handler under the order.

AR 6316-17. Plaintiffs interpret this letter to opine that Raisin Valley Farms would not be a handler in the situation where Raisin Valley Farms uses a custom packer to pack its raisins, and would not be a handler under facts of ths action. Plaintiffs argue that the USDA "cannot have it both ways, and be situational about when it will, and will not, treat one of the Respondents as a 'handler' or 'packer.'"

The USDA points out that Plaintiffs "omit any mention of the critical part of the [Keeney] letter and misconstrue entirely its importance in this case." The Keeney Letter was a response to a March 15, 2001 letter that Plaintiffs wrote to the USDA in which Plaintiffs advised the USDA that "Raisin Valley Farms has entered into an arrangement whereby Del Rey Packing will 'custom pack' in 50 pound boxes the certified 100% organic raisin crop produced by Raisin Valley Farms." AR 6316-17. Plaintiffs further informed the USDA in their letter that:

> Raisin Valley Farms will not stem, sort, seed, or grade its organic raisin crop. That will be accomplished pursuant to the "custom packing" arrangement entered into between Raisin Valley Farms and Del Ray Packing...Del Rey Packing will not take title, will not place any of Raisin Valley Farms' raisins in its inventory, and will not sell any portion of Raisin Valley Farms' organic raisin crop. It will merely "custom pack" on behalf of Raisin Valley Farms. As such, Raisin Valley Farms does not fall within the definition of a "packer" under...the Raisin Marketing Order.

*Id*. Plaintiffs asked the USDA to "advise if your interpretation of...the...Marketing Order is inconsistent with the intent of the marketing program as interpreted by Raisin Valley Farms." *Id*. The Keeney Letter was written in response to Plaintiffs' March 2001 letter to address the hypothetical situation therein described. And while the Keeney Letter opines that Raisin Valley Farms would not be handler or packer under that hypothetical situation, Plaintiffs omit the following key passage:

> Rather, Del Rey would be a packer and handler. Del Rey would acquire Raisin Valley Farms' raisins, and would further be required to meet the order's obligations regarding volume regulation, quality control, payment of assessments to the Raisin Administrative Committee (RAC), and reporting requirements.

AR 6316-17.

From this letter exchange, three points emerge.  First, the USDA made clear that it would consider a custom or toll packer to be a handler that would be required to fulfill the Marketing Order obligations.  The evidence supports, and Plaintiffs do not deny, that Lassen Vineyards performed "packer" functions on Raisin Valley Farms' raisins, such as stemming, sorting, and seeding.  Thus, the USDA's opinion in the Keeney Letter is consistent with the JO's opinion; to wit, an entity that custom packs raisins is a handler and has a duty to meet the obligations under the Marketing Order.

Second, the Keeney Letter informed Plaintiffs that transfer of title was irrelevant to whether the custom packer was considered to be a handler under the Marketing Order.  In their letter, Plaintiffs proposed that Del Rey will not place any of Raisin Valley Farms' raisins in its inventory, will not sell any portion of Raisin Valley Farms' organic raisin crop, and will not take title.  Plaintiffs proposed Del Rey would merely "custom pack" on behalf of Raisin Valley Farms.  Under this scenario, the Keeney Letter concluded that Del Rey would be a packer and handler subject to the provisions of the Marketing Order.  Thus, Plaintiffs were on notice since 2001 that a packer acquires raisins even if there is no transfer of title.[4]

Third, Plaintiffs's reliance on this hypothetical scenario is inapposite, because it describes a situation that is incongruent with the evidence.  Plaintiffs hypothesized a situation in which they would perform none of the handler or packer functions.  Instead, Raisin Valley Farms would pay an unrelated third-party (Del Rey) to stem, sort, seed and grade the raisins.  Under this scenario, the raisin producer would not be a handler.  As set forth above, however, Raisin Valley Farms and Lassen Vineyards collectively packed raisins during the 2002-2003 and 2003-2004 crop years, and charged others for that packing service.  To the extent that Raisin Valley Farms and Lassen Vineyards produced raisins, they were not subject to the Marketing Order.  But, to the extent that Raisin Valley Farms and Lassen Vineyards custom packed raisins for themselves and others, they were subject to the Marketing Order as handlers.  The latter activities are the subject of this action, and the latter subjects Plaintiffs to the

---

[4]Although the term "acquire" is unambiguous, this Court would defer to the USDA's interpretation of the meaning of the term if it were. *Barnhart v. Walton*, 535 U.S. 212, 218 (2002) ("Courts grant an agency's interpretation of its own regulations considerable legal leeway.");*Auer v. Robbins*, 519 U.S. 452, 461 (1997) (To the extent that a regulation is ambiguous, the agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation.").  Here, the USDA consistently interpreted the meaning of the term "acquire" to include the scenario proposed, and ultimately pursued, by Plaintiffs.

1    Marketing Order. In sum, Plaintiffs are correct that the Keeney Letter "should be dispositive;" however,

2    the disposition of Plaintiffs' claims based on an accurate reading of this letter exchange and the evidence

3    favors the USDA.

4    **4. Evidence Supports Liability of both Lassen Vineyards and Raisin Valley Farms**

5        In opposition to the USDA's summary judgment motion, Plaintiffs assert that the "USDA

6    failed...to assert substantial specific facts as to each 'Respondent' (Plaintiffs herein) that would justify

7    that that specific person or a specific entity was a 'handler' and a handler who 'acquired' raisins and thus

8    subject to the substantial (in this case massive) penalties under the AMAA." The Court notes that the

9    JO used the terms Raisin Valley Farms, Lassen Vineyards, Mr. Horne, and "Mr. Horne and partners"

10   interchangeably in its Initial Decision. At different points of the opinion, the JO found that Raisin

11   Valley, Lassen Vineyards, and "respondents" individually engaged in the handling of raisins and violated

12   the Marketing Order. Ultimately, the JO imposed sanctions against both Raisin Valley Farms and

13   Lassen Vineyards. In the Reconsideration Order, the JO refers to the respondents through the term "Mr.

14   Horne and partners" only. AR 757-778. The JO's findings and orders depart from the ALJ's order that

15   imposed sanctions against Lassen Vineyards only. Plaintiffs contend that there was no evidence

16   presented that any entity handled, packed or acquired raisins.

17       While this Court finds that the evidence supports the ALJ's conclusion that Lassen Vineyards

18   was the handler of raisins and violated the Marketing Order, this Court will not disturb the JO's orders.

19    For the following reasons, this Court finds that there is "such relevant evidence as a reasonable mind

20   might accept as adequate to support" the JO's conclusion. *Pierce*, 487 U.S. at 565. Because the record

21   supports more than one rational interpretation of the evidence, the Court will defer to the JO's decision,

22   *Bayliss*, 427 F.3d at 1214 n.1, and will not substitute its judgment for the JO's opinion. *Marsh*, 490 U.S.

23   at 378.

24       First, this Court agrees with the JO to find "Mr. Horne's business structure confusing at best."

25   AR 685. As the JO explained:

26       There appear [sic] to be three main entities, Raisin Valley Farms, Lassen Vineyards, and
         Raisin Valley Farms Marketing Association. The main problem is that at various times
27       Mr. Horne uses the name "Raisin Valley Farms" for each. Without Mr. Horne's personal
         knowledge, it is impossible to know which bank account in the name of Raisin Valley
28       Farms is the account for which company. In fact, there was not a bank account in the

16

1    name of Lassen Vineyards.

2    AR 685.  The following findings of fact represent the interplay between the three entities:

3        When Raisin Valley Marketing Association received an order for raisins, Mr. Horne
         contacted one of the Raisin Valley Marketing Association members inquiring if the
4        member would accept the price offered.  When Mr. Horne found a grower willing to
         accept the order, he told that grower to bring the raisins to Lassen Vineyards' packing
5        plant to be stemmed, sorted, cleaned, graded, and packaged.  The buyer picked up the
         packaged raisins and left a bill of lading.  When the buyer paid for the raisins, Mr. Horne
6        deposited the funds into an account.  Originally, the funds were deposited into an account
         in the name of Mr. and Mrs. Horne.  Mr. Horne changed the account to one named
7        "Raisin Valley Farms Marketing, LLT."  Now, Raisin Valley Marketing Association has
         a "bone fide Association bank account" from which Mr. Horne, for Raisin Valley Farms
8        Marketing Association, disburses funds to Lassen Vineyards, the brokers, and the
         growers.

9

10   AR 674-75.  Moreover, the JO found that the confusion of the parties was caused, in significant part, by

11   Mr. Horne's untimely and incomplete production of records.  AR 684-85.  The JO found that evidence

12   established that the Plaintiffs "play[ed] a kind of shell game with interlocking partnerships and a

13   marketing association to try to conceal their role as first handler."  AR 775.  Based on Mr. Horne's

14   testimony, in which he interchanged the entities, intermingling of funds, absence of separate bank

15   accounts, and intermingling of duties between the entities, this Court finds that substantial evidence

16   supports the JO's decision against both Raisin Valley Farms and Lassen Vineyards.

17       Second, substantial evidence supports the JO's finding that Raisin Valley Farms took direct part

18   in the handling and packing of raisins.  The Hornes, under the name of Raisin Valley Farms, filed RAC-5

19   forms during the 2001-2002, 2002-2003, and 2003-2004 crop years, "notifying the RAC of their

20   intention to handle raisins as a packer under the Raisin Order."  AR 670.  "All of the raisins packed by

21   Lassen Vineyards in crop years 2002-2003 and 2003-2004 were packaged in boxes stamped with the

22   handler number 94-101.  That number had been assigned to Marvin D. Horne and Laura R. Horne" doing

23   business as Raisin Valley Farms. AR 671.  Because all of the raisins packed out of Lassen Vineyards

24   were stamped with Raisin Valley Farms' handler number, it was not unreasonable to conclude that

25   Raisin Valley Farms handled and acquired raisins.

26       **5.    Plaintiffs' were subject to the Marketing Order notwithstanding their "Lease"
              Arrangement**

27

28   Plaintiffs contend that the Marketing Order regulates "[o]nly genuine handlers," and "does not

1   reach equipment lessors." Plaintiffs describe the evidence as follows:

2       Yes, there was evidence that Lassen Vineyards leased employees for the purpose of
        packing raisins and that it also leased equipment to farmers, including the Hornes and
3       Durbahn [sic] so they can pack their own raisins but the Durbahns and Hornes were
        simply producers, not handlers, and Lassen Vineyards, acting as a lessor of labor and
4       equipment and without putting raisins in the stream of interstate commerce or selling said
        raisins do not make them handlers, not packers, nor processors, nor is evidence of
5       "acquiring" raisins.

6   Pl. Reply, 4:5-10. The Court finds that the JO correctly rejected Plaintiffs' arguments.

7       In his testimony, Mr. Horne testified that for a fee, his "family" packing operation "furnished

8   equipment and employees to run the equipment." AR 1669. Lassen Vineyards owned the land,

9   structures, and equipment of the packing plant. AR 1938-40. Lassen Vineyards did not have a separate

10  bank account from the Hornes, Raisin Valley Marketing, or Raisin Valley Farms. AR 2034.

11      Substantial evidence adduced at the hearings demonstrate that Plaintiffs performed the functions

12  of a handler. According to Mr. Horne's testimony, raisin producers paid Lassen Vineyards through

13  Raisin Valley Marketing and Raisin Valley Farms to send their raisins "through the line; the cap stems

14  are removed; the raisins are washed; they're vacuumed; substandard is removed; sticks, stems, rocks,

15  and any...foreign material." AR 1668. The raisins at Lassen Vineyards then go:

16      through an observation line where employees remove something that may not have been
        vacuumed out or a berry or raisin that may have mold on it. And from there, it goes into
17      a scale where it's weighed and put into a box with liner–a food grade plastic liner. And
        the box is then put through taping machine, where it is sealed. And then it goes through
18      another metal detector with a marking device that puts on the side of the box the date, the
        time packed, the packer number assigned to me, and the lot number of the grower or the
19      customer.

20  AR 1669-70. Mr. Horne testified that his operation charged raisin producers a fee for the "use of the

21  facility, the labor, the fiber, the plastic [used to package the raisins]." AR 1943. While Mr. Horne may

22  characterize this arrangement as a lease, the evidence demonstrates that Plaintiffs were paid a fee to

23  handle raisins that they had physical possession of in their packing plant, thus subjecting them to the

24  Marketing Order.

25      Mr. Horne's testimony also revealed that the employees who operated Lassen Vineyards'

26  equipment were employees of Plaintiffs, despite Mr. Horne's efforts to obscure this fact by creating

27  another "leasing" agreement. It is undisputed that Mr. Durbahn supervised and Marvin managed the

28  Lassen Vineyards plant. Plaintiffs assert that the raisin producers packed their own raisins or leased

employees who were not associated with the partnership.  However, there is no evidence that anyone other than employees of Lassen Vineyards worked at the plant.  Moreover, the "leasing employer[s]" of the employees were Ms. Horne and Ms. Durbahn, and most of the employees worked on Lassen Vineyards land.

Legally and factually**,** Plaintiffs were handlers subject to the Marketing Order despite the "leasing" agreements.  No language in the AMAA or Marketing Order provides an exemption for an entity that performs the functions of a handler under a leasing agreement.  Plaintiffs fail to support their argument that lessors of labor and equipment are exempt from the Marketing Order.  The substantial evidence establishes that Plaintiffs were handlers, notwithstanding the various entities and lease agreement arrangements.  The evidence supports the JO's conclusion that Plaintiffs were playing "a kind of shell game with interlocking partnerships and a marketing association to try to conceal their role as first handler." AR 775.  The evidence further supports the JO's conclusion that "Marvin Horne and partners put in place a scheme to enhance their profitability by avoiding the requirements of the Raisin Order.  By so doing, they obtained an unfair competitive advantage over everyone else in the raisin industry who complied with the Raisin Order." AR 694.

### 6. Raisin producers are exempt from the Marketing Order in their capacity as producers, not in their capacity as handlers

Plaintiffs contend that as producers, they are exempt from the Marketing Order.  As set forth above, the AMAA and the Marketing Order impose obligations on handlers, not producers.  The AMAA specifically excludes producers from regulation pursuant to the Marketing Order. 7 U.S.C. §608c(13)(B).  More specifically, the AMAA provides that a marketing order does not apply to "any producer *in his capacity as producer*." 7 U.S.C. §608c(13)(B) (emphasis added).

The exemption of 7 U.S.C. §608c(13)(B) applies to Raisin Valley Farms and Lassen Vineyards in their capacities as raisin producers, but does not provide an exemption from the Marketing Order in their capacities as handlers.  "The language 'in his capacity as ***' limits the exemption[.]" *Acme Breweries v. Brannan*, 109 F. Supp. 116, 188 (N. D. Cal. 1952) (holding that hops producer  was exempt from regulation as a producer under § 8c(13) (B) of the Act, but that it could be regulated as a handler since it did something to the hops other than grow them).  Based on the express and explicit limiting

1   clause, Plaintiffs are only exempt from the Marketing Order in their capacity as producers of raisins. *See*

2   *Ideal Farms, Inc. v. Benson*, 288 F.2d 608, 614 (3d Cir. 1961), *cert. denied*, 372 U.S. 965 (1963) ("

3   Other provisions of this section of the Act explicitly recognize that a person or business entity may be

4   engaged in the milk business in more than one capacity and that a producer is exempt from regulation

5   only in his capacity as a producer.") (citing 7 U.S.C. §608c(13)(B)); *see also, United States v. United*

6   *Dairy Farms Co-op Ass'n*, 611 F.2d 488, 491 n.7 (3rd Cir. 1979) ("producers who also function as

7   handlers...are subject to regulation under the milk marketing order); *Freeman v. Vance*, 319 F.2d 841,

8   842 (5th Cir. 1963) (same).  As the administrator's action against Plaintiffs focuses on Plaintiffs'

9   activities as handlers, the

10  7 U.S.C. §608c(13)(B) exemption is inapplicable. *See Lion*, 416 F.3d at 1360 ("Although producers are

11  not directly bound by the statute, 7 U.S.C. § 608c(13)(B), under the specific terms of the Raisin

12  Marketing Order, all persons seeking to market California raisins out-of-state are deemed handlers and

13  must comply with the Order.")

14      In opposition, Plaintiffs repeat the assertion that "noone at USDA advised the Plaintiffs that

15  [their proposed activities] would violate the Marketing Order."  To the contrary, the USDA advised

16  Plaintiffs on *multiple* occasions that a raisin producer who performs handling functions upon his or her

17  own crop is subject to the Marketing Order.  Additionally, the administrator and the RAC advised

18  Plaintiffs that their proposed activities would fall within the Marketing Order regulations.  Accordingly,

19  Plaintiffs' assertion is insincere at best.

20      In addition to the Keeney Letter above, the USDA sent Plaintiffs advisory letters to interpret the

21  Marketing Order regulations as they relate to Plaintiffs' proposed activities.  In a January 18, 2002 letter,

22  Maureen T. Pello, Senior Marketing Specialist in the Fresno, California Field Office of the AMS

23  informed Mr. Horne that his proposed activities would make him a handler under the Marketing Order:

24          As we discussed, based upon your description of your proposed activities, you would be
            considered a handler under the Federal Marketing Order for California raisins...As a
25          handler, you would be required to meet all of the order's regulations regarding volume
            control, quality control (which includes incoming and outgoing inspections),
26          assessments, and reporting to the Raisin Administrative Committee.

27  AR 6329.  On May 20, 2002, the administrator (AJ Yates) responded to an inquiry from the Hornes with

28  the following message:

1

> You indicate in your correspondence that you plan to pack and market your own raisins. Such activities would make you a handler under the order. As a handler, you would be required to meet all of the order's regulations...Those who pack raisins are handlers under the order.

2

3

4 AR 6330-31. A year later, the administrator reiterated this point in response to another letter from the

5 Hornes. The administrator wrote: "You state that 'handler producer' raisins are not acquired and

6 therefore are not subject to the order's reserve requirements. This is not accurate. Handlers who

7 produce and handle raisin production are subject to marketing order requirements, including reserve

8 requirements." AR 6373-74.

9      The RAC also advised Mr. Horne that he is not exempt from the Marketing Order as a producer

10 if he handles raisins. On January 21, 2002, the RAC's Director of Compliance advised Mr. Horne in

11 a letter that a handler is not exempt from the Marketing Order even if he or she is a producer. AR 2444-

12 45. Notably, the Director of Compliance explained: "More than half of the recognized handlers on the

13 RAC Raisin Packer list are also producers of raisins," and that those handler-producers comply with the

14 Marketing Order's requirements. *Id*.

15        **7.**     **Farmer to Consumer Direct Marketing Act is inapplicable**

16      Plaintiffs contend that they were exempt from the Marketing Order because their activities were

17 in compliance with the Farmer to Consumer Direct Marketing Act, 7 U.S.C. §3001 et seq. ("Farmer to

18 Consumer Act"), passed by Congress forty years after the AMAA. Plaintiffs assert that the Farmer to

19 Consumer Act is a "national policy that encouraged producers' circumvention of packers and

20 middlemen." The Farmer to Consumer Act's statement of purpose declares:

21

> It is the purpose of this chapter to promote, through appropriate means, and on an economically sustainable basis, the development and expansion of direct marketing of agricultural commodities from farmers to consumers. To accomplish this objective, the Secretary of Agriculture (hereinafter referred to as the "Secretary") shall initiate and coordinate a program designed to facilitate direct marketing from farmers to consumers for the mutual benefit of consumers and farmers.

22

23

24

25 7 U.S.C. §3001. Plaintiffs argue that the JO erred to impose assessments and penalties of nearly

26 $700,000 "for selling raisins directly to the consumer, avoiding the 'middle man' as Congress directed

27 the Secretary to implement in 1976 through 7 U.S.C. §3001."

28      The USDA contends that the JO correctly rejected Plaintiffs' argument that the Farmer to

1  Consumer Act creates an exemption to the Marketing Order.  The USDA argues that  Plaintiffs may not

2  rely on the Farmer to Consumer Act for two reasons.  First, the USDA maintains that nothing in the

3  language of the Farmer to Consumer Act creates an exemption to the Marketing Order.  Second, the

4  USDA asserts that Plaintiffs offered no evidence that their activities were within the meaning of the

5  Farmer to Consumer Act.  As discussed below, both of the USDA's arguments are meritorious.

6       Both the ALJ and the JO found Plaintiffs' argument related to the Farmer to Consumer Act

7  "patently specious."  AR 772.  This Court agrees.  The ALJ and JO concluded that the Farmer to

8  Consumer Act does not exempt raisin producers from the requirements of the Marketing Order.  In this

9  appeal, Plaintiffs have failed to articulate why this conclusion is "arbitrary, capricious, an abuse of

10  discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).  The USDA points out that

11  nothing in the language of the Farmer to Consumer Act creates an exception to the Marketing Order.

12  Plaintiffs repeat their position that they are exempt from the Marketing Order pursuant to the Farmer to

13  Consumer Act, but cite no authority to support their position.  Without authority or argument to support

14  their position, Plaintiffs fail to carry their burden to identify the fault in the JO's reasoning and

15  conclusion. *See, Save Our Heritage, Inc*, 269 F.3d 49.  Accordingly, the JO's decision that the Farmer

16  to Consumer Act does not exempt Plaintiffs from the requirements of the Marketing Order is not clearly

17  erroneous.

18       Moreover, even if the Farmer to Consumer Act did create an exemption to the Marketing Order

19  for raisin producers, Plaintiffs failed to establish that their activities fell within the Farmer to Consumer

20  Act or its goals.  The Farmer to Consumer Act defines "direct marketing" from farms to consumers as:

21       the marketing of agricultural commodities at any marketplace (including, but not limited
        to, roadside stands, city markets, and vehicles used for house-to-house marketing of
22       agricultural commodities) established and maintained for the purpose of enabling farmers
        to sell (either individually or through a farmers' organization directly representing the
23       farmers who produced the commodities being sold) their agricultural commodities
        directly to individual consumers, or organizations representing consumers, in a manner
24       calculated to lower the cost and increase the quality of food to such consumers while
        providing increased financial returns to the farmers.

25

26  7 U.S.C. §3002.  Pursuant to this statutory definition, Plaintiffs would need to sell their raisins "directly

27  to individual consumers" in marketplaces such as "roadside stands, city markets," farmer's markets, and

28  the like to fall within the Farmer to Consumer Act. *Id*.  Plaintiffs introduced no evidence to support their

22

repeated claim that the raisins packed at Lassen Vineyards were sold directly to consumers. To the contrary, the evidence submitted led the JO's reasonable conclusion that: "Mr. Horne and partners sold raisins in wholesale packaging and quantities, frequently to candy makers and other food processors as ingredients for other food products. Mr. Horne and partners showed no connection between their business activities and the goals of the Farmer-to-Consumer Direct Marketing Act." AR 772. As the USDA points out, the evidence introduced during the administrative hearing established that Plaintiffs' raisins were packaged in large cases (AR 1740-41) and sold in large quantities–often tens of thousands of pounds–to commercial food companies. E.g., AR 2458 (invoice from Raisin Valley Farms to New York candy company for 1,160 twenty-five-pound cases of raisins); AR 2724 (invoice to Canadian food company for 1,190 thirty-pound cases of raisins); AR 2732 (invoice to Pennsylvania nut products company for 1,400 thirty-pound cases of raisins); AR 2863 (invoice to baking company for 700 thirty-pound cases of raisins). Plaintiffs offer no evidence to refute these invoices and offer no evidence that Plaintiffs sold raisins directly to consumers. Accordingly, the substantial evidence of the administrative record supports the JO's conclusion that the Farmer to Consumer Act was inapplicable to Plaintiffs and their activities during the 2002-2003 and 2003-2004 crop years.

**B.     Whether the penalties imposed violate the Excessive Fines Clause of the Eighth Amendment**

Plaintiffs contend that the assessments and penalties imposed by the JO violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. Plaintiffs argue that the imposition of "almost $700,000–for selling raisins directly to the consumer, avoiding the 'middle man' as Congress directed," is an excessive fine because: (1) the USDA cannot demonstrate "harm" from Plaintiffs' activities; (2) Plaintiffs' actions were in compliance with the Farmer to Consumer Act; and (3) Plaintiffs "used every available means to determine in advance whether or not what they anticipated and proposed doing was an alleged violation of the Marketing Order."

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8. The word "fine" within this amendment has been interpreted to mean "a payment to a sovereign as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Browning-Ferris Industries*

1  *of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989)).  The Excessive Fines Clause thus "limits

2  the government's power to extract payments, whether in cash or in kind, as punishment for some offense.

3  " *Austin v. United States*, 509 U.S. 602, 609-610, (1993) (emphasis deleted); *see also*, *Enquist v. Oregon*

4  *Dep't of Agric.*, 478 F.3d 985, 1007 (9th Cir. 2007) (Excessive Fines Clause applies to a government

5  action that constitutes a punishment for an offense).   Pursuant to *Bajakajian*, *supra*, a fine is

6  unconstitutionally excessive if it is "grossly disproportional to the gravity of the defendant's offense."

7  524 U.S. at 334-35.  "Excessive fines challenges involve a two-step inquiry: (1) whether the Excessive

8  Fines Clause applies, and (2) if so, whether the fine is 'excessive.'" *Enquist*, 478 F.3d at 1006 (citing

9  *Bajakajian*, 524 U.S. at 334).

10  The JO imposed three distinct remedies against Plaintiffs: (1) an order to pay the RAC

11  $483,843.53 pursuant to 7 C.F.R. §989.166(c); (2) an order to pay the RAC $8,783.39 in assessments

12  pursuant to 7 C.F.R. §989.80(a); and (3) civil penalties in total of $202,600 pursuant to 7 U.S.C.

13  §608c(14)(B).  Plaintiffs' Eighth Amendment arguments are the same for each of the three penalties and

14  assessments, and Plaintiffs assert that the entire sum is unconstitutional.   Nevertheless, this Court

15  considers Plaintiffs' challenge as it applies to each remedy under each regulation to determine whether

16  the Excessive Fines Clause applies and, if so, whether the fine was excessive.

17  When reviewing the JO's choice of sanctions, this Court is limited to determining "whether,

18  under the pertinent statute and relevant facts, the Secretary made an allowable judgment in choice of

19  remedy." *Balice*, 203 F.3d at 689 (citing *Farley & Calfee, Inc. v. U.S. Dep't of Agric.*, 941 F.2d 964, 967

20  (9th Cir.1991)).   This Court  will not overturn a penalty unless it is either "unwarranted in law or

21  unjustified in fact." *Bosma v. U.S. Dep't of Agric.*, 754 F.2d 804, 810 (9th Cir.1984) (citing *Butz v.*

22  *Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-88 (1973)).

23      **1.    Reserve requirement compensation**

24  The JO ordered Plaintiffs to pay $483,843.53 to the RAC, pursuant to 7 C.F.R. §989.166(c),

25  which reads:

26      **Remedy in the event of failure to deliver reserve tonnage raisins**.  A handler who fails
to deliver to the Committee, upon request, any reserve tonnage raisins in the quantity and

27  quality for which he has become obligated...shall compensate the Committee for the
amount of the loss resulting from his failure to so deliver...The amount of compensation

28  for any shortage of tonnage shall be determined by multiplying the quantity of reserve

raisins not delivered by the latest weighted average price per ton received by producers during the particular crop year for free tonnage raisins of the same varietal type or types[.]"

*Id*.  Pursuant to this regulation, the JO multiplied the quantity of the reserve raisins Plaintiffs failed to deliver for crop years 2002-2003 and 2003-2004 by the applicable average prices per ton to arrive at the total penalty.  Plaintiffs do not challenge the JO's calculation of the fine.  Rather, Plaintiffs argue that the penalty violates the Excessive Fines Clause because the USDA failed to demonstrate a harm in the amount of $483,843.53.

The USDA argues successfully that the Excessive Fines Clause is inapplicable to the penalty imposed based on 7 C.F.R. §989.166(c), because the regulation is compensatory, not punitive.  The plain language of the statute makes clear that this provision requires a handler who fails to deliver reserve raisins to "*compensate* the Committee *for the amount of the loss* resulting from his failure to deliver."  7 C.F.R. §989.166(c) (emphasis added).  Compensating the government for a loss serves a remedial purpose, but is not punitive. *Bajakajian*, 524 U.S. at 328 (citing Black's Law Dictionary 1293 (6th ed. 1990) ("[R]emedial action" is one "brought to obtain compensation or indemnity")).  By its terms, the penalty pursuant to 7 C.F.R. §989.166(c) compensates the RAC for lost revenues and recovers the value that Plaintiffs failed to deliver into the reserve pool.  Thus, the penalty imposed, which allows the USDA to recover from Plaintiffs the dollar equivalent of the California raisins that Plaintiffs failed to hold in reserve for crop years 2002-2003 and 2003-2004, is remedial rather than punitive. *See*, *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237 (1972) (monetary penalty provides "a reasonable form of liquidated damages" to  the Government and is thus a "remedial" sanction because it compensates Government for lost revenues).  Because 7 C.F.R. §989.166(c) is a remedial provision, the JO's order based on that regulation does not impose a "fine" subject to the Excessive Fines Clause.[5]

### 2.    Assessment payment

The JO ordered Plaintiffs to pay $8,783.39 in assessments for the 2002-2003 and 2003-2004 crop years, pursuant to 7 C.F.R. §989.80(a), which reads:

---

[5] Even if the Excessive Fines Clause applies to the challenged regulation, the fine imposed by the JO does not violate the Eighth Amendment because the fine is not "excessive," as explained more fully *infra*.

1
2
3
4

> Each handler shall, with respect to free tonnage acquired by him...pay to the [RAC], upon demand, his pro rata share of the expenses...which the Secretary finds will be incurred, as aforesaid, by the [RAC] during each crop year...Such handler's pro rata share of such expenses shall be equal to the ratio between the total free tonnage acquired by such handler...during the applicable crop year and the total free tonnage acquired by all handlers during the same crop year.

5   The JO multiplied the established assessment rate of $8 per ton by the established free tonnages to

6   determine the total assessments due for the 2002-2003 and 2003-2004 crop years.  Plaintiffs do not

7   challenge the JO's calculation of the assessments.

8         Similar to the challenge above, Plaintiffs argue that the JO's order to pay $8,783.39 was an

9   excessive fine because the USDA failed to demonstrate harm.  Plaintiffs argue that they were not

10  handlers, were not subject to the Marketing Order, and the JO's order is a "post hoc vendetta against

11  Plaintiffs" by the USDA to punish Plaintiffs for activities that comply with the Farmer to Consumer Act.

12        The USDA contends that the remedy under 7 C.F.R. §989.80(a), like 7 C.F.R. §989.166(c)

13  discussed above,  is compensatory.  The USDA argues that the JO's order to pay $8,783.39 in

14  assessments was designed to compensate the RAC for Plaintiffs failure to pay the assessments, as

15  required by the Marketing Order.  The USDA concludes that 7 C.F.R. §989.80(a) is not subject to the

16  Excessive Fines Clause.

17        The provision that requires handlers to pay assessment to the RAC, 7 C.F.R. §989.80(a), is not

18  punitive in nature; the assessments are levied to fund the RAC and its operations.  *See Evans v. United*

19  *States*, 74 Fed. Cl. 554, 557 (2006), *aff'd by Evans v. United States*, 250 Fed. Appx. 321 (Fed. Cir.

20  2007).  As set forth above, the RAC receives no federal appropriations.  The RAC is funded by the

21  assessments levied on handlers pursuant to 7 C.F.R. §989.80(a) and from the proceeds of sales of the

22  reserve raisins withheld from the open market. *Evans*, 74 Fed. Cl. at 557 (citing 7 C.F.R. §§989.53,

23  989.79, 989.80(a), 989.82).  Under this regulation, the Marketing Order requires all raisin handlers to

24  pay assessments to the RAC to fund the RAC and its operations.  The obligation to pay is automatic and

25  is triggered by a handler's acquisition or receipt of raisins; it requires no culpability. *C.f.*, *Bajakajian*,

26  524 U.S. at 328 (forfeiture of currency is punishment because it is a an "additional sanction...imposed

27  at the culmination of a criminal proceeding and requires conviction of an underlying felony").  Thus,

28  assessments are not imposed on handlers as a punishment for an action.  Because 7 C.F.R. §989.80(a)

is a funding regulation that is not punitive in nature, the JO's order based on that regulation does not impose a "fine" subject to the Excessive Fines Clause.

### 3.    Civil Penalties

In addition to the compensatory assessments and penalties above, the JO imposed civil penalties totaling $202,600 against Plaintiffs pursuant to 7 U.S.C. §608c(14)(B), which reads:

> Any handler subject to an order issued under this section...who violates any provision of such order may be assessed a civil penalty by the Secretary not exceeding $1,000 for each such violation.   Each day during which such violation shall be deemed a separate violation...The Secretary may issue an order assessing a civil penalty under this paragraph only after notice and an opportunity for an agency hearing on the record.   Such order shall be treated as a final order reviewable in the district courts of the United States in any district in which the handler subject to the order is an inhabitant, or has the handler's principle place of business.   The validity of such order may not reviewed in an action to collect such civil penalty.

Neither party disputes that this provision is punitive in nature, designed to punish a handler who violates any provision of the Marketing Order.   Thus, the civil penalty is a "fine" within the meaning of the Excessive Fines Clause.

Because the JO imposed a "fine" pursuant 7 U.S.C. §608c(14)(B), this Court must determine whether the fine imposed was excessive.   A fine is unconstitutionally excessive if it is "grossly disproportional to the gravity of the defendant's offense." *Bajakajian*, 524 U.S. at 334-35.   "Whether a penalty is grossly disproportionate calls for the application of a constitutional standard to the facts of a particular case, and in that context, de novo review is appropriate." *Balice*, 203 F.3d at 698.

The JO found that Plaintiffs committed the following violations:

- Twenty violations of section 989.73 of the Raisin Order (7 C.F.R. §989.73) by filing inaccurate forms with the RAC on 20 occasions.

- Fifty-eight violations of section 989.58(d) of the Raisin Order (7 C.F.R. §989.58(d)) by failing to obtain incoming inspections of raisins on 58 occasions.

- Two violations of 989.80 of the Raisin Order (7 C.F.R. §989.80) by failing to pay assessments to the RAC in crop year 2002-2003 and crop year 2003 and 2004.

- Five hundred ninety-two violations of sections 989.66 and 989.166 of the Raisin Order (7 C.F.R. §§989.66, .166) by failing to hold raisins in reserve and by failing to pay the RAC the dollar equivalent of the raisins not held in reserve.

1    •       One violation of section 989.77 of the Raisin Order (7 C.F.R. §989.77) for failing to allow access

2              to Plaintiffs' records.

3    To deter Plaintiffs from continuing to violate the Marketing Order, and to deter others from similar

4    future violations, the JO concluded that the following civil penalties for these violations were

5    "appropriate" and "sufficient": (1) $300 per violation for filing inaccurate reporting forms; (2) $300 per

6    violation for the failure to obtain incoming inspections; (3) $300 per violation for failing to pay the

7    assessments; (4) $300 per violation for failure to hold raisins in reserve; and (5) $1000 for the failure

8    to allow access to records.

9          When determining whether fines are excessive, the Court first considers that "judgements about

10   appropriate punishment for an offense belong in the first instance to the legislature." *Balice*, 203 F.3d

11   at 699 (quoting *Bajakajian*, 524 U.S. at 336) (citing *Solem v. Helm*, 463 U.S. 277, 290 (1983)). The

12   USDA points out that the civil penalties imposed by the JO fall well below the level authorized by

13   Congress. As set forth above, Congress authorized civil penalties up to $1,000 for each violation. In

14   addition, Congress mandated that "[e]ach day during which such violation continues shall be deemed

15   a separate violation." 7 U.S.C. §608c(14)(B). The JO found 673 separate violations, spanning over a

16   two year period of time. Thus, the JO was authorized by statute to impose a civil penalty of no less than

17   $673,000. The potential civil penalty calculation would be substantially larger if the JO imposed the

18   maximum penalty of $1,100, pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990,

19   and/or considered that each violation occurred over multiple days.[6]  Considering the fine in total,

20   $202,600 is not an excessive fine to punish 673 separate violations of the Marketing Order, when the

21   JO could have imposed a fine of $673,000 or more. The JO imposed a $300 fine for 672 violations, less

22   than one-third of the amount authorized by statute. *C.f., Balice*, 203 F.3d 684 (finding that statutory

23   maximum of $2,000 penalty for AMAA violation of almond marketing order was not an excessive fine

24   for handler's failure to report, keep accurate records, and hold almonds in reserve). Accordingly, the

25   Court finds that the $202,600 in civil penalties assessed on Plaintiffs by the JO pursuant to 7 U.S.C.

26   _____

27        [6]As the JO noted, the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, 28 U.S.C. §2461 note,
adjusted the civil monetary penalty that may be assessed under the AMAA.  For each violation of a marketing order, the

28   maximum civil penalty is $1,100. 7 C.F.R. §3.91(b)(1)(vii).

1   §608c(14)(B) is not "grossly disproportional to the gravity of the [plaintiffs'] offense[s]." *Bajakajian*,

2   524 U.S. at 334-35.

3       Plaintiffs contend that the fines are excessive because: (1) the USDA cannot demonstrate "harm"

4   to anyone caused by Plaintiffs' activities; (2) Plaintiffs' actions complied with the Farmers to Consumers

5   Direct Marketing Act; (3) Plaintiffs were not handlers and, therefore, not subject to the Marketing Act.

6   Plaintiffs' second and third arguments have been discussed *infra*, and are unpersuasive and inapposite

7   to this analysis.  As to Plaintiffs' argument that would require the USDA to demonstrate harm,  the Ninth

8   Circuit rejected this argument in a case similar to the one at bar.

9       In *Balice*, almond handlers challenged penalties imposed under 7 U.S.C. §608c(14) as

10  constitutionally excessive because the violations resulted in "no harm to the Government and no harm

11  to the industry." 203 F.3d at 699.  The *Balice* almond handlers committed offenses similar to those

12  committed by Plaintiffs, and the USDA imposed fines on them pursuant to 7 U.S.C. §608c(14) for

13  violating the record keeping, reporting, and reserve requirements of the Almond Marketing Order, 7

14  C.F.R. §981.1 et seq, a marketing order similar to the Marketing Order governing Plaintiffs.  In *Balice,*

15  the appellant almond handlers argued that the JO's decision to increase the fine from $1000 per violation

16  to $2000 without requiring the USDA to demonstrate harm was arbitrary and capricious.  In rejecting

17  the appellant's argument, the Ninth Circuit looked at the language of the statute and found that to require

18  the USDA to demonstrate harm "would contravene the express terms" of the statute.  *Balice*, 203 F.3d

19  at 694.  Similarly, the express terms of 7 U.S.C. §608c(14) require the USDA to demonstrate that a

20  handler violated the marketing order, but do not require any further demonstration.  Accordingly, this

21  Court "declines to accept [Plaintiffs'] suggestion that the USDA was required to show harm to the

22  government before the JO could" impose a penalty pursuant to 7 C.F.R. §989.166(c).[7] *Balice*, 203 F.3d

23  at 694.

24      Moreover, Plaintiffs' arguments misrepresent Plaintiffs' conduct and culpability.  As set forth

25

26  [7] For this reason, the USDA was also not required to demonstrate harm before ordering Plaintiffs to compensate the
    RAC for the failure to hold the reserve raisins pursuant to 7 C.F.R. 989.166(c).  Pursuant to the regulation, the USDA shall
27  recover the amount of the loss from a handler who fails to deliver reserve tonnage raisins to the RAC.  7 C.F.R. §989.166(c).
    No language in the regulation requires the USDA to demonstrate harm, and Plaintiffs point to no authority to construe the
    regulation in this way.  Because Plaintiffs' suggestion that 7 C.F.R. §989.166(c) requires the USDA to demonstrate "harm"
28  contravenes the express terms of the regulation, this Court rejects it.

above, the JO did not err to find that Plaintiffs were subject to the Marketing Order as handlers that acquired raisins.  Although they were handlers, Plaintiffs filed inaccurate reports, failed to obtain inspections, failed to hold raisins in reserve, and failed to allow access to records.  As the Ninth Circuit explained in *Balice*, 203 F.3d at 699, these actions threaten to cause severe consequences to the entire industry:

> Balice willfully failed to maintain records for important transactions...That violation largely frustrated the USDA's attempts to ensure that Balice was complying with other provisions of the Almond Marketing Order, and it interfered with the Almond Board's ability to set its economic policy.

> Even worse, Balice unlawfully disposed of reserve almonds, which were lawfully salable at only $0.05 to $0.08 per pound, when the prevailing market price for the almonds was $1.40 per pound.  That conduct not only resulted in an illegal profit of roughly $246,677, but it also undermined the Secretary's efforts to protect the stability of the almond market.

Similarly, the USDA has an important need to control the stability of the raisin market, as expressed in the AMAA and the Marketing Order.  Like the actions of the *Balice* almond handlers, Plaintiffs' actions interfered with the RAC's ability to set its economic policy.  Plaintiffs' introduction of the reserve raisins into the open market yielded illegal profits and could have resulted in market instability and a downward spiral in prices.  Because of the serious nature of the Plaintiffs' conduct, with its severe and far-reaching effects, this Court finds that a $300 fine is not an excessive amount for each of Plaintiffs's violations, described above, and $1,000 is not an excessive fine for Plaintiffs' failure to allow access to their records. *See, Balice*, 203 F.3d 684; *Cole v. USDA*, 133 F.3d 803 (11th Cir. 1998) (holding that a $400,000 penalty, representing a forfeiture of 75% of the sale price of over-quota tobacco, was not excessive given the legislative purpose of discouraging the over-supply of tobacco in the marketplace).[8]

**C.     Whether the reserve requirements violate the Fifth Amendment as a physical taking without just compensation**

Plaintiffs argue that the reserve raisin program of the Marketing Order, 7 C.F.R. §§989.65-98, constitutes a physical taking of tangible property by the government without just compensation in

---

[8]The instant action is distinguishable from the cases relied upon by the USDA in that the JO imposed both compensatory and civil penalties and assessments on Plaintiffs.  In *Balice* and *Cole*, the JO imposed penalties pursuant to either one regulation or the other, but not both.  Because Plaintiffs failed to raise this point, however, the Court need not address whether the distinction changes the Excessive Fines Clause analysis.

violation of the Fifth Amendment to the United States Constitution.  Plaintiffs assert, without citation, that the "elements necessary for a takings claim are present if (1) private property, (2) is taken, (3) for public use, (4) without just compensation."  Pl. Memo, 20:3-4.  Without citation, Plaintiffs argue that they "routinely evidenced and argued all these elements."  Plaintiffs assert that raisins are personal, private property and the government has paid no just compensation for the reserve tonnage raisins that the USDA takes each year.  Plaintiffs contend that although Congress may take actions to regulate the industry,  "[n]o court has ever held that the Commerce Clause trumps, eliminates, or eviscerates the Takings Clause in a physical takings case."  Thus, "[w]hile Congress may allow the permanent deprivation of a citizens [sic] physical property, the government must pay fair market value." Plaintiffs conclude: "The government can't have it both ways: it can't refuse to pay just compensation, and then penalize, monetarily, Plaintiffs for refusing to transfer title and possession to the government." *Id*. at ll. 14-16.

As introduced above, the Marketing Order creates the raisin reserve requirement program.  The purpose of the reserve requirement program is to control the supply of raisins in the domestic market and, accordingly, to regulate the price of the commodity.  "By regulating the amount of raisins in this market, the USDA can, in effect, regulate the price at which raisins are sold domestically." *Lion Raisins, Inc. v. U.S.*, 58 Fed. Cl. 391, 394 (2003).  Accordingly, the "primary focus" of the market control program is to "maximize return to the grower." Daniel Bensing, *The Promulgation and Implementation of Federal Marketing Orders Regulating Fruit and Vegetable Crops Under the Agricultural Marketing Agreement Act of 1937*, 5 San Joaquin Agric. L. Rev. 3, 6 (1995).

The reserve requirement program is administered by the RAC.  By February 15 of each crop year, the RAC must recommend to the USDA the portion of the crop that should be made available to sale without restrictions ("free tonnage") and the portion that should be withheld from the market ("reserve tonnage").  7 C.F.R. §§989.54(d), 989.65.  Based on the RAC's recommendations, and after obtaining the approval of two-thirds of California raisin producers, or of producers of two-thirds of raisins "produced for market, the USDA promulgates a regulation fixing the percentages of "reserve tonnage" and "free tonnage" raisins. 7 U.S.C. §§608c(8)(A)-(B), 9(B)(i)-(ii); 7 C.F.R. §§989.55, 989.65.  In *Lion III*, the court explained the reserve requirement program as follows:

1

2

3

4

5

6

7

8

9

10

> Free-tonnage raisins may be disposed of by the handler in any marketing channel. Producers receive immediate payment from handlers, at the field market price, for the free-tonnage raisins. The market price for the free-tonnage raisins, or the field price, is not set by the RAC, but is determined through a private bargaining process carried out between producers' and handlers' bargaining associations. Producers are not paid immediately for reserve raisins. Reserve-tonnage raisins are held by handlers for the account of the reserve pool, which is operated by the RAC. *Lion I*, 58 Fed.Cl. at 394. Reserve raisins are sold, as authorized by the RAC, in non-competitive outlets, such as school lunch programs. Id.; 7C.F.R. §§ 989.65-67. The statute provides for "the equitable distribution of the net return derived from the sale [of reserve pool raisins] among the persons beneficially interested therein." 7 U.S.C. § 608c(6)(E). The RAC is charged with selling the reserve raisins in a manner "intended to maxim[ize] producer returns and achieve maximum disposition of such raisins by the time reserve tonnage raisins from the subsequent crop year are available." 7 C.F.R. § 989.67(d)(1). Since the mid-1990's, the RAC has been using the reserve pool to support an industry export program that effectively blends down the cost of exported California raisins thereby allowing handlers to be price-competitive in export markets where prices are generally lower than the domestic market.

11    416 F.3d at 1360.

12    The Marketing Order requires handlers to separate raisins into two sets of bins–one for "free

13 tonnage" and one for "reserve tonnage." 7 C.F.R. §§989.54, 989.55, 989.65, 989.66(b)(2). "The reserve

14 raisins are not warehoused in any central location, but rather stored by handlers on their own premises,

15 and are released for sale per the instructions of the RAC." *Lion III*, 416 F.3d at 1360.  Title to the

16 "reserve tonnage" portion of the producer's raisins automatically transfers to the RAC for sale in

17 secondary, non-competitive markets.  *See* 7 C.F.R. §§989.65, 989.66(a), (b)(1), (4).  In exchange,

18 "[p]roducers are entitled by regulation to an equitable distribution of the net proceeds from the RAC's

19 disposition of the 'reserve tonnage' raisins." *Evans*, 74 Fed. Cl. at 557.

20    In crop year 2002-2003, the free tonnage was 53% and the reserve tonnage was set at 47% of a

21 producer's crop.  The RAC sold the 2002 reserve pool for $970 per ton in 2004.  None of the money the

22 RAC received was paid back to the raisin producers.  For the 2003-2004 crop year, the reserve tonnage

23 was set at 30%.[9]

24    It is undisputed that every year, through the reserve requirement program, the RAC takes title

25 to a significant portion of a California raisin producer's crop.  The Court must determine here whether,

26 as Plaintiffs argue, this constitutes a "physical taking" of their property by the government that requires

27

28    [9]The reserve tonnage percentage changes each year, sometimes radically. For example, the reserve tonnage portion was 62.5% in 1983 and 17.5% in 2005.

just compensation under the Fifth Amendment.  The federal government is liable in a Taking Clause suit for the actions of the RAC, as its agent. *Lion III*, 416 F.3d 1356.  The issue of what constitutes a "taking" is a federal question governed by federal law. *Johnson v. U. S.*, 479 F.2d 1383 (Fed. Cir. 1973).  To determine the meaning of "property," and what property rights exist under the Fifth Amendment, federal courts look to local state law. *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977).

The Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005).   The Fifth Amendment is designed not to limit governmental interference with property rights per se, but rather to secure compensation in the event of an otherwise proper interference amounting to a taking. *Id*.   Here, the RAC takes title to Plaintiffs' reserve tonnage through the AMAA and the Marketing Order by operation of Congress's power to regulate the raisin industry through the Commerce Clause authority. *See United States v. Rock Royal Co-Op., Inc.*, 307 U.S. 533, 569, 572 (1939) (upholding AMAA as constitutional under the Commerce Clause and rejecting Fifth Amendment due process and taking contentions, because "the Congress would have, clearly, the right to permit only limited amounts of milk to move in interstate commerce, [and therefore] it might permit the movement on terms of pool settlement here provided."); *see also*, *Evans*, 74 Fed. Cl. at 559 (discussing *Rock Royal*).  Congress's power to regulate commerce, however, "does not immunize the federal government from a takings claim under the Fifth Amendment." *Evans*, 74 Fed. Cl. at 560.  Thus, "the Commerce Clause may provide the authority for a taking, but it does not negate the Fifth Amendment's command that the government, having taken a person's property, must pay just compensation." *Id*. (citing *Yancey v. United States*, 915 F.2s 1534, 1540 (Fed. Cir. 1990)).

The question presented to this Court is whether the transfer of title on the reserve tonnage raisins is a *physical* taking that requires compensation.  The federal government may "take" private property, requiring just compensation, either by physical invasion or by regulation. *American Pelagic Fishing Co., L.P. v. U.S.*, 379 F.3d 1363 (Fed. Cir.), *cert. denied*, 545 U.S. 1139 (2004).  *Norman v. U.S.*, 63 Fed.Cl. 231 (2003), *aff'd*,  429 F.3d 1081, *cert. denied*, 547 U.S. 1147 (2003).  The distinction between a "physical" taking and a "regulatory" taking is significant.  *See, Brown v. Legal Foundation of*

1    *Washington*, 538 U.S. 216 (2003) (payment of compensation is required whenever the government

2    acquires private property for a public but the text of the Just Compensation Clause contains no

3    comparable reference to a regulatory taking).  Whereas an invasion of a person's physical property will

4    be considered a physical taking, a "taking" is less likely to be found when a party challenges the

5    government's interference with a property interest that arises from some public program that adjusts

6    benefits and burdens of economic life to promote the common good. *Sadowsky v. City of New York*, 732

7    F.2d 312 (2nd Cir. 1984).  Moreover, while physical takings are compensable, *see Loretto v.*

8    *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982), not all regulatory takings are.  *See,*

9    *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690 (8th Cir. 1996) (Whether particular

10   restriction amounts to taking depends on economic impact of regulation on claimant, extent to which

11   regulation has interfered with distinct, investment-backed expectations, and character of government

12   regulation.).  With this distinction in mind, this Court turns to Plaintiffs' argument that the reserve

13   requirement constitutes a physical taking.

14          One other court has considered the issue at bar.[10]  In *Evans*, 74 Fed. Cl. 554, the Court of Federal

15   Claims considered whether the transfer of title to the reserve tonnage raisins constituted a physical

16   taking.  The *Evans* court noted that under California law, the plaintiffs "unquestionably held title to their

17   raisins grown in their fields." 74 Fed. Cl. at 563.  The court found that at the time the raisins become

18   subject to regulation under the Marketing Order (when the handler acquires the raisins), "the producers

19   acquired in exchange personal property consisting of cash (for the 'free tonnage' raisins) and an

20   equitable interest in the net proceeds of the 'reserve tonnage' raisins." *Id*.  The court understood this

21   transfer, required under the Marketing Order, to render plaintiffs the following property interests:

22   "Plaintiff producers retained a property interest in the raisins, and they retained a property interest in the

23   proceeds from the raisins."  The *Evans* court concluded that the transfer of reserve tonnage raisins was

24   not a physical taking, because:

25              although the RAC gains title to some of the raisins that plaintiffs grow, the transfer does
             not have the same consequences as, for example, entry by governmental officials upon
26           their land for purposes of confiscating their rains would have.  There is no physical

27   _____

28        [10]For other takings claims related to the raisin Marketing Order, see *Lion Raisins v. U.S.*, 58 Fed. Cl. 391 (2003)
     (Lion I); *Lion Raisins v. U.S.*, 57 Fed. Cl. 435 (2003) (Lion II); and *Lion Raisins v. U.S.*, 416 F.3d 1356 (2005) (Lion III).

1
2

> invasion of property (citations omitted)...nor is there any "direct appropriation of property." (citations omitted).  Instead, the government is the recipient of a portion of the raisins that plaintiffs shipped to handlers subject to the marketing order.

3  74 Fed. Cl. at 563.  In addition, the *Evans* court concluded that plaintiffs had no property interest in their

4  reserve tonnage raisins.  Without a property interest in the raisins, the Takings Clause was not

5  implicated.  The Court opined that "if plaintiffs have a takings claim, it would relate to their property

6  interest, equitable in nature, in the net proceeds from the disposition of the 'reserve tonnage.'" *Id*. at 564.

7   The court's conclusion that plaintiffs have no property interest in the reserve tonnage raisins is based

8  on the following:

9
10

> In essence, plaintiffs are paying an admissions fee or toll–admittedly a steep one–for marketing raisins.  The government does not force plaintiffs to grow raisins or to market the raisins; rather, it directs that if they grow and market raisins, then passing title to their "reserve tonnage" raisins to the RAC is the admission ticket.

11  *Id*.

12      This Court agrees, in part, with the *Evans* ruling to find that the transfer of title to the reserve

13  tonnage does not constitute a *physical* taking.  A physical taking generally occurs occur when there is

14  a physical occupation of a person's property by the government. *Norman v. U.S.*, 63 Fed.Cl. 231, *aff'd*,

15  429 F.3d 1081, *cert. denied*, 547 U.S. 1147 (2003); *Yee v. City of Escondido*, 503 U.S. 519 (1992)

16  physical taking occurs only where the government requires a landowner to submit to the physical

17  occupation of his land).  By contrast, a  "regulatory taking" in violation of the Takings Clause may occur

18  when government action, although not encroaching upon or occupying private property, goes too far and

19  still amounts to a taking. *Anaheim Gardens v. U.S.*, 444 F.3d 1309 (Fed. Cir. 2006); *Norman*, 63 Fed.

20  Cl. 231 (a regulatory taking occurs when a regulation deemed necessary to promote the public interest

21  so imposes on the owner's property rights that, in essence, it effectuates a taking); *Allain-Lebreton Co.*

22  *v. Department of Army*, *New Orleans Dist., Corps of Engineers*, 670 F.2d 43 (5th Cir. 1982) (Where

23  there is no physical invasion of or physical damage to a plaintiff's property by the government, the

24  government can be held responsible for a taking only when its own regulatory activity is so extensive

25  or intrusive as to amount to taking.).  Thus, while it is not necessary that the government actually take

26  physical possession of property in order for there to be a "taking," a physical invasion must take place

27  for there to be a physical taking, which includes a physical taking requires a  "permanent physical

28  occupation" on one's land.  *Ridge Line, Inc. v. U.S.*, 346 F.3d 1346 (Fed. Cir. 2003); *see also,*

*e.g., Loretto,* 458 U.S. at 421 (cable television company's installation of its cable facilities on plaintiff's property).   In *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), the Supreme Court explained the distinction:

> The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use. Our cases establish that even a minimal "permanent physical occupation of real property" requires compensation under the Clause. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." *Id.*, at 415, 43 S.Ct. 158.

*Id.* at 617.  According to the *Palazzolo* court, "government actions [that] do not encroach upon or occupy property yet still affect and limit" use of property are "regulatory taking[s]." *Id.*

Here, Plaintiffs do not demonstrate a physical taking of their raisins by the government.  The RAC gains title of Plaintiffs' reserve tonnage raisins by operation of the federal regulation of the Marketing Order.  The government does not physically invade Plaintiffs' land to take the raisins, nor does the government take physical possession of the raisins.  The reserve tonnage remains in the possession of the handlers.  Moreover, the transfer of title is not absolute.  Plaintiffs retain an equity interest in their reserve tonnage raisins.  Based on these considerations, this Court finds that Plaintiffs have failed to establish that reserve raisin program of the Marketing Order constitutes a physical taking. *See, Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003) (Loss of 96% of possible rate of return on investment was "compensable regulatory taking" under Fifth Amendment, for precluding participants in government program from prepaying their mortgages after 20 years, and barring them from unregulated rental market and other more lucrative property uses); *c.f.*, *Rose Acre Farms, Inc. v. U.S.* 559 F.3d 1260 (Fed. Cir. 2009) (egg producer did not suffer a compensable regulatory taking when, due to USDA's salmonella regulations, approximately 43% of its table eggs were diverted to the breaker egg market, thus reducing those eggs' market value by approximately 10%).[11]  Because there is no physical

---

[11] Although the USDA relies on rulings related to other marketing orders to argue that Plaintiffs have no property interest in their raisins, this Court notes the distinctions between the raisin Marketing Order and the marketing orders of other commodities.  Unlike most of the other marketing orders, the raisin marketing order "effects a direct transfer of title of a

1    taking, Plaintiffs' Fifth Amendment claim fails.[12]

2    **D.      Whether the JO's dismissal of Plaintiffs' administrative petition was arbitrary, capricious,**
3    **and contrary to the law**

4          Plaintiffs attempt to challenge the JO's February 8, 2007 order on Plaintiffs' administrative

5    petition fails, as this Court lacks subject matter jurisdiction to consider Plaintiffs' claim.  As a Court of

6    limited jurisdiction, this Court must consider whether subject matter jurisdiction exists and dismiss an

7    action if jurisdiction is lacking. *Southern Pacific Transportation Co. v. City of Los Angeles*, 922 F.2d

8    498, 502 (9th Cir. 1990), *cert. denied*, 112 S. Ct. 382 (1991); *see also*, Fed. R. Civ. P. 12(h)(3) ("If the

9    court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

10         Plaintiffs' appeal of the JO's dismissal of Plaintiffs' administrative petition is barred by the

11   statute of limitations.  The statutory provision for judicial review of a ruling on a petition to modify a

12   marketing order is 7 U.S.C. 608c(15)(B), which provides:

13         The District Courts of the United States...in any district in which such handler is an
           inhabitant, or has his principal place of business, are hereby vested with jurisdiction in
14         equity to review such ruling, *provided a bill in equity for that purpose is filed within*
           *twenty days from the date of the entry of such ruling.*
15

16   This statute is jurisdictional. *See, Kingman Reef Atoll Investments, L.L.C. v. U.S.*, 541 F.3d 1189, 1996

17   (9th Cir. 2008); *see also, John R. Sand & Gravel Co. v. United States*, 552 U.S.130, 128 S.Ct. 750,

18   753-56,(2008).  Thus, this Court only has jurisdiction to review a handler's 7 U.S.C. §608c(15)(B)

19   appeal if that appeal is filed within twenty days.  The JO issued its decision on February 4, 2008.

20   Plaintiffs initiated this action on October 14, 2008.  Accordingly, Plaintiffs' untimely challenge is barred

21   by the statute of limitations and this Court lacks jurisdiction to consider it.  *See United States v. Bravo-*

22   *Diaz*, 312 F.3d 995, 997 (9th Cir. 2002) ("It is fundamental to our system of government that a court of

23

24   ───────────────

25   producer's 'reserve tonnage' raisins to the government, and it requires physical segregation of the reserve-tonnage raisins held
     for the government's account." *Evans*, 74 Fed. Cl. at 558.  Thus, the government taking under the raisin Marketing Order is
26   distinct and must be considered on its own facts.

27         [12] Although Plaintiffs do not establish a physical takings claim, Plaintiffs are not without recourse.  In addition to
     a regulatory takings claim, and as fully explained in *Evans*, Plaintiffs have at least three other legal theories they could present
28   to challenge the reserve requirement. 74 Fed. Cl. at 564-65.

1  the United States may not grant relief absent a constitutional or valid statutory grant of jurisdiction.").[13]

2  Because this Court lacks jurisdiction over Plaintiffs' cause of action related to the 7 U.S.C. 608c(15)(B)

3  petition, this Court must dismiss it, and cannot reach the merits of the parties' arguments.

4

5                              **VI. CONCLUSION AND ORDER**

6          For the foregoing reasons, the Court GRANTS defendant USDA's summary judgment motion

7  and DENIES Plaintiffs' summary judgment motion.  The clerk of court is DIRECTED to enter judgment

8  in favor of defendant USDA and against Plaintiffs and to close this action.

9

10  IT IS SO ORDERED.

11  **Dated:      December 9, 2009                       /s/ Lawrence J. O'Neill**
                                              UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27          [13] In addition, Plaintiffs' challenge to the JO's dismissal of Plaintiffs' administrative petition is the subject of a
     separate action.  In that separate action, Plaintiffs' claims were dismissed as untimely.  Plaintiffs appeal of that dismissal order
28  is currently pending.